My name is Kelly Tobin, I am the attorney for John Johnston, the appellant in this matter. Mr. Johnston appeals from the District Court's grant of summary judgment in favor of Prudential Insurance Company and against Mr. Johnston on his motion for summary judgment on the issue of whether the insurance company abused its discretion in denying him LTD benefits. Counsel would you pull that mic down toward you just a little bit? Yes. How's that? Sorry. Usually I'm a loud talker, Your Honor, so I apologize. No problem. Mr. Johnston appeals the District Court's grant of summary judgment in favor of Prudential on the claim that Prudential didn't act with abusive discretion when it terminated Mr. Johnston's LTD benefits. Mr. Johnston was awarded LTD benefits, long-term disability benefits, under an ERISA plan that he received at work. The review, the District Court's review, as both of the parties agreed to, is an abuse of discretion standard with respect to the plan administrator's actions in this case. An abuse of discretion standard applies when the ERISA plan grants the administrator the discretion to review, to determine eligibility for benefits, as well as to interpret the plan terms. Because the appellate review of the District Court's review is de novo, so this Court's review of the claims administrator's decision in this case is for an abuse of discretion standard. An abuse of discretion standard has been, is applicable to this particular situation, has been determined that if the case is, if the plan administrator's decision won't be reversed if the decision is arbitrary and capricious. The cases further indicate that the plan administrator's decision should be affirmed if it's reasonable, which means that it's supported by substantial evidence. The courts, the cases indicate that substantial evidence indicates that more than the scintilla of evidence, but less than the preponderance of evidence is the standard. And finally, the courts have held that the plan administrator's decision should be affirmed if reasonable people could have reached a similar decision given the evidence before him and not that a reasonable person would have. Counsel, we're very familiar with the standards. Okay. Would you show how that standard wasn't, wasn't met here? Yes, sure. Certainly, Your Honor. Mr. Johnson, as we set forth in our brief, was a computer programmer for Commerce Bank Shares, which is a regional banking organization with presences in the Kansas City and St. Louis areas. His job entailed no physical work whatsoever. It basically was a mental job. He was an IT professional for the company and provided their IT services. His mental work involved complicated tasks, involved problem solving, thought analysis, and creativity. As part of his status as an employee, he was entitled to receive the long-term disability policy that was granted to the similar employees under the ERISA plan at Commerce. That policy, and what we're here about today, defines disability when prudential determines that you're unable to perform the material and substantial duties of your regular occupation due to sickness or injury. And they made that determination here, correct? They did make that determination here, Your Honor. That is correct. However, that determination is an error. The policy further indicates that sickness is defined as any disorder of your body or mind but not an injury. And in this particular situation, what had happened to Mr. Johnson was that in 2014, he began having migraines and- His brain tumor, or it did happen. Yeah, colloid cyst. Yes, exactly. And a stent was placed in there, and he had received a stent in order to relieve the pressure from his brain. He had surgery for this in the summer of 2013, and then on October- Counsel, we're familiar with the facts. Okay. We understand the standards, but you've got limited time, and you need to make your case as to why the insurance company's termination of the LTD was invalid or should be reversed as truly an abuse of discretion. Yes. I understand, Your Honor. Unfortunately, these ERISA cases are somewhat fact-intensive, and I appreciate the fact that you're familiar with the facts, but some of the facts I think need to be pointed out is that in the reviewing of Mr. Johnson's LTD benefits, there was a meeting that was held by Prudential in March of 2014 in which their own internal physician had indicated that Mr. Johnson's- he believed that Mr. Johnson's cognitive abilities had improved, but it's not clear if the claimant had adequate abilities to accomplish his work. That statement is important in this case, Your Honor, because it's that statement that you see that if he's got some sort of cognitive disabilities or cognitive deficiencies, that creates a sickness under the terms of the policy. Which reviewing physician was that? This was Dr. Rajesh Wadhwa on March 24th, 2014, and he was an internal reviewing doctor in the claims department for Prudential. At that time, they asked for further records from the medical providers regarding Mr. Johnson's condition, and I believe the record indicates that they received those, and I believe that all of the treating physicians indicated that he was permanently disabled due to his cognitive dysfunctions. In the summer of 2014, Prudential had- Well, we're not- there's not an issue about the initial determination and his initial continuance. The issue that's before us is the termination some months later. That's correct. And under this policy, it's incumbent upon the claimant to show that disability continues. In fact, we believe that's exactly what had happened, because when you look at the reviewing physician- reviewing psychologist Dr. Denny's report, he indicated in his report- it was in his clinical opinion that Mr. Johnson had some level of cognitive deficits that affected his daily life. This is the equivalent of what is a sickness under the terms of the policy. The questions remaining after that are what are the severity of the cognitive deficits. What about the- what I assume was probably what the company in some respects relied upon, the concern that the claimant was malingering in the testing process. That's true. Obviously, we deny that, Your Honor, but Dr. Denny also indicates that the presence of malingering does not necessarily rule out that cognitive deficits can coexist. And he's, in fact, stated in his report that the problems in the case is that the medical record demonstrates that the conditions exist for which significant cognitive deficits are possible, but that Mr. Johnson was also lingering. Dr. Denny also stated that he could not rule out cognitive and emotional deficits when he stated that he's not able to say that Mr. Johnson is not functionally impaired. In fact, the district court even recognized that ultimately Dr. Denny could not find one way or the other whether Mr. Johnson was functionally impaired. So what was left for the insurance company to look at simply was that you have a reviewing doctor who's a psychologist that conducted one day of testing determining that he's sick. He still has cognitive deficits, which is the first part of the policy that needs to be determined whether a disability exists, the severity of which is what Dr. Denny simply couldn't determine, simply because he believed that Mr. Johnson was feigning his attempts at the test. Mr. Johnson obviously denies this, but what is very clear from Dr. Denny's report is that he does find some evidence that there's cognitive deficits. And again, it fits the definition of sickness under the terms of the policy. What the insurance company did not do at this point is it did not notify Mr. Johnson that it would need further evidence on his ability to obtain whether he could do the former material and substantial duties of his job, i.e., what is the severity of his cognitive impairment. Mr. Johnson has always maintained from the very beginning that he is unable to perform those duties. In fact, this is the exact same evidence that was used by the insurance company when they initially awarded the LTD benefits. Was there any evidence in the record at all of his vocational capabilities at the time of the discontinuance of the benefits? No, other than what was provided by Marcia Meyer, who was the treating psychologist of Mr. Johnson, who submitted her report indicating that she did not believe that he was feigning conditions. In fact, she's the only one that indicated that his cognitive inabilities affected his ability to do daily work. So the only evidence in the record on the appeal is that there was an illness, and the only evidence regarding whether he could continue to do or whether he could do his duties was by one of the treating psychologists who stated that he couldn't. What's important, I think, in this case, Your Honor, because we get into whether it's a reasonable interpretation or not and what is satisfactory or not to the insurance company is that at the beginning when they awarded the LTD benefits, the only evidence that they looked at in determining whether Mr. Johnson could perform those duties was his own statements. There was not any empirical testing. There was not any testing that indicated one way or the other whether his mental capacity was such that he could still perform these high-level computer functionings. And so what they did is they disregarded the exact same evidence that they relied upon and the type of evidence that they relied upon when they initially granted the LTD benefits and refused to accept that in denying those benefits. Because under both scenarios, at the beginning and at the termination, it was clear that there was a sickness that occurred. The question was, what was the severity? And again, the severity is measured under the terms of this policy with regard to whether he could perform the material and substantial duties of his previous employment. Mr. Tobin, you're in your rebuttal. You can continue now if you like or you can reserve. I'll probably reserve if that's okay, Your Honor. Thank you. Ms. Sonneborn? May it please the Court. Your Honor, as you're familiar with and as you have identified, this is an heuristic case with very clear standards of law, very well-established precedent by both the Supreme Court and this Court as to what applies in this case. And there's simply no question that the District Court made the right decision here under that well-established precedent. The ERISA plan, which as we all know, is the only thing here giving Mr. Johnson the right to any benefits at all, is very clear that he maintains the burden of proof at all times with regard to showing that he is enabled to perform the functions of his job. Prudential, in fact, gave Mr. Johnson the benefit of the doubt immediately following his surgery after he filed his claim and asked for additional evidence providing him benefits. They made clear to him at that time that when they provided him those benefits that they were going to request additional information, seek information from his physicians, seek information from the neuropsychological testing that he underwent, and would continue to review that information while they, again, gave him the benefit of the doubt and paid him the claims. They then went through that process and looked at both the neuropsychological tests that he submitted, the only one of which that supported that he, in fact, had any substantive cognitive impairment occurred at the same time that he had the surgery. That's a question here. They then continued ongoing medical review internally, asking for additional information, including the outside first neuropsychological test that we've spoken about with regard to Dr. Denny. Dr. Wadawa, who plaintiff's counsel referred to, in fact, opined that it was necessary to have that neuropsychological testing to try to get an understanding of what was going on with plaintiff's cognitive abilities because the records that he had submitted simply didn't support his position that he was unable to do his job. At that time, plaintiff, in fact, underwent the tests, the neuropsychological tests we've Dr. Denny could include prevented him from doing his job. And in fact, there was a conclusion that based on the extreme test results, that there was, in fact, likely malingering. That's simply not evidence that the plaintiff here was meeting the standard under the policy. And as a result, Prudential terminated his benefits at that time based on that evidence. In response, and contrary to what counsel said, Prudential sent plaintiff what is our standard appeal letter that describes what additional information he could submit at time if he believed there was contrary evidence to support his disability. What did you give him notice to provide? I'm sorry, could you repeat the question? What did you tell him he could provide as evidence? Yes, it says you may submit with your appeal any other written comments, documents, records, or any information related to your claim, medical evidence, or other information to support your position, such as copies of therapy notes, any additional treatment records from physicians, any actual test results. It was very clear that he could submit any additional information of that nature that he believed supported his claim. In other words, your argument was that he was not blindsided? I would argue he was not. We fully complied with a very clear and well-articulated ERISA regulations, which very specifically identify what we needed to tell him here. And so it was very clear in this case in which he was, in fact, represented by counsel. Oftentimes before you, we come in a case where the insurance company is proceeding and just interacting with an individual claimant. That's not the situation in this case. We were interacting with counsel. At what time did they tell him, you may submit any further evidence? At the time that his initial claim was terminated, so he received it. Did they give any further notice whatsoever? Subsequent to that point in time, when he denied his appeal after he failed to submit additional evidence that contradicted Dr. Denny's appeal or Dr. Denny's analysis, they told him that he could complete a second appeal if he wanted to. He chose not to do that. So he had two different opportunities to produce evidence to prudential that was contrary to what Dr. Denny concluded. And then, again, there is another, a fourth NPT here that occurred after the initial claim denial when the plaintiff filed his appeal. That second testing by a board-certified neuropsychologist, again, confirmed that what she was seeing on the test results was malingering, that it simply wasn't explainable by actual cognitive disabilities. And because of that, there was no evidence that the plaintiff actually suffered sufficient cognitive disabilities to show he could not perform the duties of his job. While counsel continually focused on the notion that sickness alone was somehow sufficient under this policy to show that he was entitled to benefits, the reality is that he had a burden of proof under the clear case law in the circuit to show that he was unable to perform the substantial duties of his job. So if he had gone and got a vocational expert to do testing to show that he couldn't go back and do the type of computer work, the technical work that he had done previously and gotten additional statements from his treating physicians that there's these thinking limitations on him, that would have, you're saying that would have put this case in a different posture? I'm saying prudential would have considered that evidence and would have had their, had physicians consider what evidence was supported. If he were able to produce sufficient evidence to convince prudential to continue him on LTD, would he have been compensated for the cost? For the cost of the additional physician exams, typically no, not under the terms of the policy. Again, because this is an ERISA plan, it's very specific about what is reimbursable under the policy, under the plan's terms. And that's typically not reimbursable. With regard to the vocational testing, Your Honor, though, as to this particular case, this is not a situation, as counsel acknowledged, where there were physical limitations on the plaintiff that were clearly articulated or the individual, in many cases, we come before the court where there's a bad back or some sort of physical limitation. And those are- There was no question, though, he had a, he had swelling on the brain due to cysts. Correct, Your Honor. He did have hydrocephalus and we certainly do not dispute it. And that's quite frankly why we paid the claim for as long as we did while we were reviewing the information. And in fact, unlike a situation that might come before you in a case involving fibromyalgia or some other condition which are frequently litigated before these courts, this is a condition that plaintiff actually had a surgery to address the condition. And it is, there was evidence in the record from the physicians hired by both the plaintiff initially from his MPT as well as the physicians, the prudential hired, that indicated that they would expect that type of surgery to relieve the pressure and the particular issues that were in place here. In fact, immediately following the surgery, plaintiff's own wife, when spoken with the MPT physician there, articulated that she thought he was doing better and had improved. So all of those things would go to the fact that this was a condition that, in fact, one would expect potentially to improve. And plaintiff produced no contrary evidence to suggest that it hadn't. And so at that point in time, given the burden of the policy always rested with plaintiff, prudential appropriately denied and terminated his claim. Had plaintiff come forward with different evidence, then surely it would have been considered as is appropriate and required under ERISA for prudential to consider and weigh that evidence. But that's not what happened here. The plaintiff produced merely a therapist note that said she believed he was tired during the initial MPT and that he continued to be unable to work based on that. But there was no response of MPT. There was no updated MRI. There was no additional information provided by his physicians. And he, again, didn't submit in response to the second voluntary appeal any additional information after prudential had him undergo a second MPT. Well, Dr. Denny's report wasn't all that ironclad, was it? He certainly identified and acknowledged, Your Honor, that it's possible that there was some cognitive deficits. But because of plaintiff's behavior on the testing, there wasn't sufficient evidence that that was, in fact, what was occurring. As a result, the plaintiff didn't meet his burden under the policy of coming forward with sufficient evidence. One wonders how Mr. Johnson could have rebutted that. Well, presumably, given the evidence of malingering and the statistical anomalies that were demonstrated there, had he really... He could find his own expert, just like you found your own. He, in fact, had two experts who reviewed his claim initially, one of whom had similar results that suggested there was malingering because there weren't valid test results based on his behavior. So you have three... There's nothing really to rebut Dr. Denny's finding, or whatever it's called, determination that there was malingering? Correct, Your Honor. In fact, there's a second MPT that came after that in response to the appeal that had the exact same conclusion from a different independent neuropsychologist who was board certified who administered a battery of tests during an all-day examination. I guess the term of art is validity indices. I've never seen that. Correct, Your Honor. It's a series of... Defense lawyers would say functional overlay with neck injuries. Yes, Your Honor. It's a series of... This is more scientific. Validity indices. Yes, Your Honor. It's a series of tests administered by neuropsychologists to try to determine cognitive abilities. And as is thoroughly detailed in the 38-page report by Dr. Denny and the nearly 25-page report by Dr. Zahar, they administered numerous tests to try to determine whether or not there were, in fact, functional capabilities. And in regard to Dr. Denny's test, they said some of the results from Mr. Johnson would only have a 2 out of 10 million chance of occurring at random. Counsel, was there any evidence in the record that the malingering was due to clinical depression? Your Honor, that's something that was speculated as a potential possibility. But again, the plaintiff introduced no evidence or any clinical support for that notion himself. To be quite honest, I think Dr. Denny and Dr. Zahar here were trying to give the plaintiff the benefit of the doubt. He chose to not respond either in response to the initial claim determination or in response to the appeal determination with any contrary evidence of his own. And given this is an ERISA plan, this is not a plan that there's an independent statutory interpretation of. We have to live by the terms of the plan. The court has been very clear of that. The obligation under Farley and Finley in this court has always rested with the plaintiff to come forward with that evidence. He simply didn't do it. And as a result, Prudential was obligated to follow the terms of its plan that it was administering for the employer here and deny the benefits. For those reasons, Your Honor, we ask that the court uphold the lower court's decision, which we believe was appropriately reached here, granting summary judgment to Defendant Prudential. Thank you, Ms. Sundborn. Thank you. Mr. Tobin, your rebuttal. We believe that, in fact, Mr. Johnson was blindsided by what had happened with Dr. Dinney and the termination of the LTD benefits. There's absolutely no record in any of Prudential's documents indicating that they informed him in advance that he was there to be tested to determine his cognitive abilities in order to perform the material and substantial duties of his job. In fact, all Dr. Dinney could possibly do would be to determine whether he was continuing to be sick under the terms of the policy. Dr. Dinney was not a computer programmer and did not have any vocational abilities whatsoever to determine whether Mr. Johnson could perform the material and substantial duties of his job. It's not a case of whether the person can lift his arm or not, and you have objective evidence in order for a viewing court or anybody to see it. This is a situation where everything is subjective. Counsel, you acknowledge, though, that under the policy, the burden for continuing proof is on the claimant. But the burden of proof has been met, Your Honor, and then in our position it has been met. The question is whether that burden satisfies Prudential. And in this particular situation, their interpretation of what satisfies them has differing standards and differing measures. At the beginning, they accepted one thing. At the termination, they didn't. In fact, Mr. Johnson was blindsided by the termination because his benefits were terminated retroactively when he got his termination letter without any indication saying, we think you might have had some problems on this past test. We want to test you for further abilities. Would you please submit to another test? It did nothing like that. All it did was simply say, based upon Dr. Dinney's report, your benefits are terminated. That's essentially what it said. If you've got anything to the contrary, let us know. But when you read Dr. Dinney's report, it clearly states that he's malingering. Mr. Johnson did not believe that he's malingering. He neither did his wife and neither did his treating psychologist who sees him often. Does not think that he's a malingerer. But when a person is defined as a malingerer, that means they're lazy and they're a liar. What about the argument, did Mr. Johnson's own experts detect some signs of malingering? At the very beginning in October, I believe, there was a Dr. Eklund's report that he did in NPT as well and he indicated that some of the answers to that were somewhat inconsistent with the amount of cognitive disability or problems that he claimed that he was having. But that didn't seem to bother Prudential. They went ahead and list and took the evidence and continued on with the disability claims up until Dr. Dinney's conclusions. But again, Dr. Dinney's conclusions are one, we believe, based upon credibility of whether Mr. Johnson was malingerer or not. So it's impossible. Are you suggesting in a way that the companies have stopped from taking a different position later in this man's life? Not at all. Not at all. But I do think that in that situation, especially in a situation where you have a mental injury, where it's just impossible to determine that that person can perform their prior duties, mentally related job duties, such as what he did here as a computer programmer by a doctor. The only thing that that can be determined is the doctor can simply say that he's sick or that he's gotten better. Not that he can still perform those duties in a cognitive fashion. And so the evidence that Mr. Johnson did provide was the exact same evidence that he provided before. Prudential just decided that at this time, they were no longer satisfied with that. But to the point of Mr. Johnson coming forward with other evidence to show that he was not a malingerer, how do you counter that? With your responses and with your effort at our testing. Because if he then took a vocational rehab test and he passed or he didn't pass, which would be the necessary case in this situation, he not pass, the insurance company is just as apt to say, well, we don't think you were giving us enough effort in that one either. So based upon our satisfaction standard, we don't agree. And it's particularly problematic when you have a mental injury type of a case. Because those are the people that are most vulnerable in society about being able to come forward and say, I'm still mentally disabled. You're forcing a person to attempt to prove a negative when you require a mentally injured person to come in and prove that they're still mentally injured. It's simply an impossible standard to bear. So for these reasons, we believe that the decision by Prudential Insurance Company in terminating the LTD benefits was not reasonable, was not supported by substantial evidence, and that all that was in the record was the fact that Mr. Johnson was still sick. And the only other evidence in the record by Mr. Johnson and his own treating psychologist indicated that he could not provide those duties. My time is up. Thank you very much. Appreciate it. Thank you, Mr. Tobin. Thank you also, Ms. Sonborn. We appreciate your presence and the argument you provided to the court this morning. I will take the case under advisement.